1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ARMONDO LEWIS,

11             Petitioner,              No. 2: 11-cv-1444 KJN P

12      vs.

13   STATE OF CALIFORNIA, et al.,       ORDER AND

14             Respondents.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. Introduction

17             Petitioner is a state prisoner, proceeding without counsel, with a petition for writ

18   of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2008 conviction for

19   two counts of attempted murder (Cal. Penal Code §§ 187(a) and 664)), two counts of assault with

20   a firearm (Cal. Penal Code § 245(a)(2)), discharging a firearm at an occupied vehicle (Cal. Penal

21   Code § 246), intentionally and personally discharging a firearm in connection with the attempted

22   murder charges (Cal. Penal Code § 12022.53(c), and personally using a firearm in connection

23   with the assault charges (Cal. Penal Code § 12022.5(a)(1)). Petitioner is serving a sentence of 34

24   years imprisonment.

25             This action is proceeding on the amended petition filed June 27, 2011. Petitioner

26   raises the following claims: 1) jury instruction error (three claims); and 2) ineffective assistance

1

1    of counsel.

2          After carefully reviewing the record, the undersigned recommends that the

3    petition be denied.

4    II.  Standards for a Writ of Habeas Corpus

5          An application for a writ of habeas corpus by a person in custody under a

6    judgment of a state court can be granted only for violations of the Constitution or laws of the

7    United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

8    interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

9    Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

10          Federal habeas corpus relief is not available for any claim decided on the merits in

11   state court proceedings unless the state court's adjudication of the claim:

12          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
13          determined by the Supreme Court of the United States; or

14          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
15          State court proceeding.

16   28 U.S.C. § 2254(d).

17          Under section 2254(d)(1), a state court decision is "contrary to" clearly

18   established United States Supreme Court precedents if it applies a rule that contradicts the

19   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

20   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

21   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

22   (2000)).

23          Under the  "unreasonable application" clause of section 2254(d)(1), a federal

24   habeas court may grant the writ if the state court identifies the correct governing legal principle

25   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

26   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

1   simply because that court concludes in its independent judgment that the relevant state-court

2   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

3   application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

4   (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

5   question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

6   omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief

7   so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

8   Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

9          The court looks to the last reasoned state court decision as the basis for the state

10  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

11  decision, "and the state court has denied relief, it may be presumed that the state court

12  adjudicated the claim on the merits in the absence of any indication or state-law procedural

13  principles to the contrary." Harrington, 131 S. Ct. at 784-85.  That presumption may be

14  overcome by a showing that "there is reason to think some other explanation for the state court's

15  decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

16         Where the state court reaches a decision on the merits but provides no reasoning

17  to support its conclusion, the federal court conducts an independent review of the record.

18  "Independent review of the record is not de novo review of the constitutional issue, but rather,

19  the only method by which we can determine whether a silent state court decision is objectively

20  unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

21  decision is available, the habeas petitioner has the burden of "showing there was no reasonable

22  basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must

23  determine what arguments or theories supported or, . . . could have supported, the state court's

24  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

25  arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

26  786.

III.  <u>Background</u>

        The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein:

> On March 10, 2008, [Tomazena] Higgins and [Adrina] Hall attended a birthday party for Gina Oakley, the girlfriend of Higgins's friend Michael Motley. The party was at the home of Oakley's aunt Mildred Dossman and defendant. Defendant and Dossman had been in a long term relationship, and Oakley considered defendant her uncle. Defendant and Dossman lived at 6612 Burdett Way in Sacramento.
>
> Defendant was at the party. He stuck out because he was "big, like a linebacker almost." No one else at the party was close to defendant's stature. The party was a "predominantly female event." In addition to defendant, the only men at the party were Dossman's three sons, Motley, and Motley's friend, Joshua Johnson.
>
> Higgins and Hall arrived at the party at approximately 10:00 p.m. that evening. Higgins drove herself and Hall to the party in Higgins's Buick. Among the cars parked outside the party was a white Chevy Tahoe. While they were at the party, Higgins, Hall, Motley, Oakley, and others went outside to smoke some marijuana. Motley and Oakley got into a "heated" argument because Oakley, who was three months pregnant with Motley's child, was drinking. Motley began "screaming and hollering" at Oakley, hit her, and pushed her on the ground.  FN3.
>
> FN3. Higgins testified Motley shoved Oakley. She denied that Motley hit Oakley or that Oakley fell on the ground.
>
> At that point, Higgins and Hall decided it was time to leave. They, along with Motley's friend Johnson, left in Higgins's car. After leaving the party, Higgins turned down a couple of streets before making her way onto 47th Avenue. While they were stopped at the intersection of 47th Avenue and Martin Luther King Jr. Boulevard, the Chevy Tahoe that had been parked outside the party "came diagonal toward" Higgins's car, drove "over [an] island," and stopped in front of Higgins's car such that Higgins's "headlights [were] on his side on his door...." The driver of the Tahoe rolled down his window, stuck out his right arm, pointed a gun at Higgins's car, and began shooting. He fired 10 or 11 shots. Thereafter, the Tahoe sped away, and Higgins drove toward a nearby light rail station. Higgins's car broke down on the way, and Higgins and Hall took off running, while Johnson "disappeared."

////

4

Higgins's car had three bullet holes in the hood, one in the left headlight, one in the bumper, one in the grill, and two in the front passenger door.

At approximately 11:45 p.m. that evening, Sacramento County Sheriffs Deputies Lizardo Guzman and Ricardo Martin received several calls regarding shots fired in the area of 47th Avenue and Martin Luther King Jr. Boulevard. One caller specified that the shooting involved a white Chevy Tahoe and a four-door vehicle. Guzman and Martin responded and found Higgins's car nearby. As they began to assess the damage to the car, Higgins and Hall ran up screaming.

Martin took a statement from Higgins, and Guzman took a statement from Hall. Higgins described the shooter as "a very large black male," 6'3' to 6'6', and 300 pounds. She identified the vehicle involved in the shooting as a white Chevy Tahoe. She said both could be located at 6612 Burdett Way and explained that she had been at a party at that location earlier that evening.

Hall also described the shooter as a "big man," 6'5', and 300 pounds. She said she had seen him at a party earlier that night, and identified the vehicle involved in the shooting as a white Chevy Tahoe, which she also had seen at the same party. She volunteered to take Guzman back to the house where she believed the shooter lived.

Higgins and Hall accompanied the deputies to 6612 Burdett Way. A white Chevy Tahoe was parked on the lawn in front of the house. Higgins identified the Tahoe as the same car that was involved in the shooting. Defendant, who matched Higgins's and Hall's descriptions of the shooter, walked outside and was detained. At the time of the incident, defendant was 6'5' and weighed 300 pounds.

Both Higgins and Hall separately identified defendant as the shooter. Higgins was 100 percent certain of her identification.

At trial, Hall denied identifying defendant as the shooter or telling a law enforcement officer that "the big black guy from the party" was driving the Tahoe and was the shooter. She said she was unable to see inside the Tahoe and could not see who was shooting. She did state that the Tahoe parked on the lawn after the shooting was the same vehicle that was involved in the shooting.

Pheng Her was stopped next to Higgins's car at the time of the shooting and telephoned 9–1–1. During the call, he described the car involved in the shooting as a brown Ford Bronco. At trial, he said he was not sure it was a Ford Bronco and may have been some other vehicle "like a Trail Blazer." When asked about the color, he said, "[I]f I have to pick one. I know it wasn't yellow. I know it

5

wasn't green. It was a dark color." Her saw "two African American[s]" in the car. He believed the driver had the firearm. He could not identify the driver, but said he was an African American man.

Shortly after the shooting, four .40–caliber dispensed shell casings and one "disfigured slug" were recovered at the intersection of 47th Avenue and Martin Luther King Jr. Boulevard. Two of the casings were PMC-brand and two were S & W-brand. One PMC-brand .40–caliber shell casing was also found "on the dash near the vehicle identification plate on the exterior of" the white Chevy Tahoe parked outside 6612 Burdett Way after the shooting. The PMC-brand casings found at the scene and that found on the Tahoe contained markings indicating they were fired from the same gun. It is possible that the S & W brand casings recovered at the scene were fired from the same gun as the PMC-brand casings; however, a full examination was not performed on the S & W-brand casings.

At 2:00 a.m. on March 11, 2008, approximately two hours and 15 minutes after the shooting, defendant's hands were swabbed for gunshot residue. A small amount of gunshot residue – two particles containing lead barium antimony – was found on defendant's left hand. "[T]he presence of these particles on someone's hands usually means they either fired a gun, they handled a fired gun or fired ammunition, or they touched something that was contaminated with gunshot residue." Over 99 percent of the particles that are characteristic of gunshot residue are lost from a person's hand within four hours of firing a weapon. A person can speed up that process by using his hands, washing his hands, or sweating.

In November 2008, Hall told an investigator with the district attorney's office that "she got a good look at the shooter" and that he "was the same guy that was at the party."

II

The Defense

Defendant did not testify at trial.

Oakley testified defendant never left the house after she returned following the altercation with Motley. She did not recall telling an investigator from the district attorney's office she was embarrassed that Motley had dumped her out on the street in front of a bunch of people. When she went back inside after the altercation with Motley "everyone ... already knew what happened outside." She then "broke the story down ..." for them. On cross-examination, she acknowledged that defendant "probably was asking what happened [and was] concerned about [her] well-being...." She

6

1    denied telling anyone that Motley left in Higgins's car. She
2    admitted two prior convictions for theft related offenses in April
     2007 and May 2008.

3    Dossman testified defendant never left the house after Oakley
     returned following the altercation with Motley. The white Chevy
4    Tahoe belonged to her daughter, Kesha. Kesha drove it to the party.
     Dossman never saw the Tahoe leave the party that night.
5    According to her, it would not start and "needed a jump." Kesha
     kept the keys to the Tahoe under the seat to avoid losing them.
6    They were under the seat during the party.

7    III

8    Redirect

9    On redirect, an investigator with the district attorney's office
     testified that in February 2009, Oakley told her that Motley
10   "dumped [her] on the street from a car" and that she was
     embarrassed by the incident. Following the altercation, she
11   returned to the house and "and basically told everyone ... she had
     just been in ... a fight with Mr. Motley." She was upset and crying,
12   and defendant asked her what happened. She was not sure whether
     defendant ever left the house that night. The last time she saw
13   Motley, "he was in [Higgins's] car and they were leaving."

14   (Dkt. No. 12 at 17-19.)

15   IV.  <u>Discussion</u>

16          The California Court of Appeal is the last state court to issue a reasoned decision

17   addressing petitioner's claims.  (Dkt. 12 at 17-24 (decision by California Court of Appeal);

18   respondent's lodged document 11 (record of order by California Supreme Court denying petition

19   for review).)  Accordingly, the undersigned considers whether the denial of petitioner's claims by

20   the California Court of Appeal was an unreasonable application of clearly established Supreme

21   Court authority.

22          A.  <u>Claims 1-3: Alleged Jury Instruction Error</u>

23          *Legal Standard*

24          A challenge to jury instructions does not generally state a federal constitutional

25   claim.  <u>See</u> <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983); <u>see</u> <u>also</u> <u>Middleton v.</u>

26   <u>Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

7

1   interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62 (1981); see also

2   Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381

3   (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether

4   a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."

5   Estelle v. McGuire, 502 U.S. at 68.  In order for error in the state trial proceedings to reach the

6   level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at

7   73.  The Supreme Court has defined the category of infractions that violate fundamental fairness

8   very narrowly.  Id. at 73.

9          Where what is at issue is the failure to give an instruction, petitioner's burden is

10  "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

11  less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

12  155 (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent

13  with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).

14  Failure to give a jury instruction under these circumstances will not amount to a due process

15  violation.  Id.

16         The burden upon petitioner is greater yet in a situation where he claims that the

17  trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

18  duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

19  claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

20  Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal

21  claim whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to

22  violate due process, the impact on the proceeding from failure to give an instruction sua sponte

23  must be of a very substantial magnitude.

24         Furthermore, the Supreme Court has held that there is no unreasonable application

25  of federal law where a state appellate court decided that a jury instruction's single incorrect

26  statement of the "imperfect self-defense" standard did not render the instruction reasonably likely

to have misled the jury.  Middleton v. McNeil, 541 U.S. 433 (2004).

*Claim 1*

Petitioner alleges that the trial court violated his right to due process by failing to sua sponte instruct the jury on assault with a firearm as a lesser included offense of attempted murder.  The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant first contends the trial court committed reversible error in failing sua sponte to instruct the jury on assault with a firearm as a lesser included offense of the crime of attempted murder as charged in counts 1 and 2. He claims that because the attempted murder allegations carried with them a sentence enhancement for using and intentionally and personally discharging a firearm, the attempted murders could not have been committed without also committing the crime of assault with a firearm, thus making the latter a lesser included offense of the former. We disagree.
>
> Counts 1 and 2 charged defendant with the attempted murders of Higgins and Hall, respectively. Each of the attempted murder counts alleged that defendant did unlawfully and with malice aforethought attempt to murder each of the victims. As to each of those counts, the information also alleged a sentence enhancement based on defendant's use and intentional and personal discharge of a firearm in violation of section 12022.53, subdivision (c).
>
> A trial court has a duty to instruct the jury on any offense "necessarily included" in the charged offense if substantial evidence lends support for the lesser crime's commission. (People v. Birks (1998) 19 Cal.4th 108, 112, 77 Cal.Rptr.2d 848, 960 P.2d 1073 (Birks).) "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (Id. at pp. 117–118, 77 Cal.Rptr.2d 848, 960 P.2d 1073; see also People v. Sloan (2007) 42 Cal.4th 110, 117, 64 Cal.Rptr.3d 137, 164 P.3d 568 (Sloan).)
>
> Defendant concedes that assault with a firearm is not an offense necessarily included in the crime of attempted murder. But, relying on Apprendi v. New Jersey (2000) 530 U.S. 466 (Apprendi), and its progeny, he argues "the trial court was required to treat the firearm enhancements as elements of the offense. As such, the use of [a] firearm was an element of the crime of attempted murder, and therefore felony assault in violation of section 245 was a lesser included offense of attempted murder."

////

In <u>People v. Wolcott</u> (1983) 34 Cal.3d 92, 192 Cal.Rptr. 748, 665 P.2d 520 (<u>Wolcott</u>), our Supreme Court held that "an allegation of firearm use under section 12022.5 should not be considered in determining [a] lesser included offense." (<u>Id.</u> at p. 101, 192 Cal.Rptr. 748, 665 P.2d 520.) The court explained that "section 12022.5 does not prescribe a new offense but merely additional punishment for an offense in which a firearm is used." (<u>Id.</u> at p. 100, 192 Cal.Rptr. 748, 665 P.2d 520.) "For the purpose of determining lesser included offenses, there is no reason to treat firearm enhancements alleged under section 12022.53 differently than those alleged pursuant to section 12022.5." (<u>People v. Bragg</u> (2008) 161 Cal.App.4th 1385, 1398, 75 Cal.Rptr.3d 200 (<u>Bragg</u>).) Indeed, in <u>Bragg</u>, we held that "[t]he allegations of an enhancement must therefore be ignored in determining necessarily included offenses to a charge of attempted murder." (<u>Ibid.</u>) Defendant maintains that <u>Wolcott</u> is no longer good law in light of the United States Supreme Court's decision in <u>Apprendi</u>. We did not address <u>Apprendi</u>'s impact, if any, on determining lesser included offenses in <u>Bragg</u>; however our Supreme Court recently rejected a similar argument in <u>Sloan</u>, <u>supra</u>, 42 Cal.4th 110, 64 Cal.Rptr.3d 137, 164 P.3d 568.

In <u>Sloan</u>, the court held that enhancement allegations may not be considered for purposes of the rule prohibiting multiple convictions based on necessarily included offenses. (42 Cal.4th at pp. 113–114, 64 Cal.Rptr.3d 137, 164 P.3d 568.) Citing <u>Wolcott</u>, the court observed: "This result is ... in accord with the longstanding rule that enhancements may not be considered as part of an accusatory pleading for purposes of identifying lesser included offenses." (<u>Id.</u> at p. 114, 192 Cal.Rptr. 748, 665 P.2d 520, citing <u>Wolcott</u>, <u>supra</u>, 34 Cal.3d at pp. 96, 100–101, 192 Cal.Rptr. 748, 665 P.2d 520.) FN4 With respect to the argument that a different result was compelled by <u>Apprendi</u>, the court stated: "[I]n <u>Apprendi</u> ..., the high court held that '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' [Citation.] The rule of <u>Apprendi</u> is grounded on the reasoning that '[t]he federal Constitution requires the elements of a crime to be proved beyond a reasonable doubt because they expose the defendant to punishment; likewise, the elements of a sentence enhancement must be proved beyond a reasonable doubt if there is exposure to increased punishment. [Citations.]' [Citation.] The rule is compelled by the federal Constitution's Fifth Amendment right to due process and Sixth Amendment right to jury trial, made applicable to the states through the Fourteenth Amendment. [Citation.].... [¶] Here, ... all of the enhancement allegations in question were submitted to the jury and proved true beyond a reasonable doubt. There is no Fifth or Sixth Amendment violation within the meaning of the high court's holding in <u>Apprendi</u>, <u>supra</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435." (<u>Sloan</u>, <u>supra</u>, 42

1        Cal.4th at pp. 122–123, 64 Cal.Rptr.3d 137, 164 P.3d 568.)

2        FN4. Defendant acknowledges our Supreme Court affirmed its holding in <u>Wolcott</u> in <u>Sloan</u>, but states that he raises the issue here
3        to preserve it for future federal review.

4        More recently, in <u>People v. Anderson</u> (2009) 47 Cal.4th 92, 97 Cal.Rptr.3d 77, 211 P.3d 584, the court reiterated that "sentencing
5        enhancements or other penalty provisions need not be treated as actual elements of offenses for all conceivable state law purposes,
6        but only where the defendant's claim implicates a federal constitutional right under the Fifth or Sixth Amendment. In
7        California, 'sentence enhancements are not "equivalent" to, nor do they "function" as, substantive offenses.' [Citation.] <u>Apprendi</u> does
8        not require or enable us to rewrite the Penal Code to convert penalty provisions ... into elements of offenses." (<u>Id.</u> at p. 118, 97
9        Cal.Rptr.3d 77, 211 P.3d 584.)

10        Here, the enhancement allegations at issue were submitted to the jury and proved true beyond a reasonable doubt. Under <u>Apprendi</u>
11        and its progeny, defendant was entitled to no more. The trial court did not err in failing to instruct the jury on assault with a firearm as
12        a lesser included offense of attempted murder.

13  (Dkt. No. 12 at 19-21.)

14        As indicated above, petitioner concedes that assault with a firearm is not a lesser

15  include offense of attempted murder.  Rather, assault is a lesser related offense of attempted

16  murder.  Jury instructions on lesser related offenses are not required under the Constitution.

17  <u>Hopkins v. Reeves</u>, 524 U.S. 88, 94-96 (1998).

18        Petitioner's argument that <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), required

19  the trial court to treat the firearm enhancement as an element of the offense is without merit.  In

20  <u>Apprendi</u>, the Supreme Court considered whether the Due Process Clause "requires that a factual

21  determination authorizing an increase in the maximum prison sentence for an offense from 10 to

22  20 years be made by a jury on the basis of proof beyond a reasonable doubt." <u>Apprendi</u>, 530 U.S.

23  at 468.  The Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that

24  increases the penalty for a crime beyond the proscribed maximum must be submitted to a jury,

25  and proved beyond a reasonable doubt." <u>Id.</u> at 490.  <u>Apprendi</u> did not address the issue of

26  whether a sentence enhancement should be considered to be an element of an offense in

1  determining whether, under state law, a lesser offense is necessarily a lesser included offense.

2  Petitioner cites no federal authority for this proposition.

3        As noted by the California Court of Appeal, the California Supreme Court has

4  repeatedly stated that sentencing enhancements should not be considered as elements of the

5  offense.  See People v. Wolcott, 34 Cal.3d 92 (1983); People v. Sloan, 42 Cal.4th 110 (2007);

6  People v. Anderson, 47 Cal.4th 92 (2009).  In Sloan and Anderson, the California Supreme Court

7  rejected the argument that Apprendi requires that sentencing enhancements be treated as

8  elements of the offense.  The undersigned concurs with the reasoning of the California Supreme

9  Court in these cases.

10        The California Court of Appeal's denial of petitioner's claim alleging that

11  Apprendi requires trial courts to treat firearm enhancements as elements of the offense for

12  purposes of determining lesser included offenses was not an unreasonable application of clearly

13  established Supreme Court authority.

14        For the reasons set forth above, this claim should be denied.

15        *Claim 2*

16        Petitioner alleges that the trial court violated his right to due process by failing to

17  instruct the jury on the lesser included offense of attempted voluntary manslaughter.  The

18  California Court of Appeal denied this claim for the reasons stated herein:

19        Defendant next contends the trial court erred in failing to instruct
20        the jury on attempted voluntary manslaughter as a lesser included
        offense of attempted murder as charged in counts 1 and 2. Again,
        we disagree.
21
22        As previously discussed, a trial court has a duty to instruct the jury
        on any offense "necessarily included" in the charged offense if
23        substantial evidence lends support for the lesser crime's
        commission. (Birks, supra, 19 Cal.4th at p. 112, 77 Cal.Rptr.2d
        848, 960 P.2d 1073.)
24
25        "Voluntary manslaughter is an unlawful killing without malice
        'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a).) 'Heat
26        of passion arises when "at the time of the killing, the reason of the
        accused was obscured or disturbed by passion to such an extent as

12

would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' (Citation.) '[T]he killing must be "upon a sudden quarrel or heat of passion" (§ 192); that is, "suddenly as a response to the provocation, and not belatedly as revenge or punishment. Hence, the rule is that, if sufficient time has ela[ps]ed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." [Citation.]' [Citation.]" (<u>People v. Hach</u> (2009) 176 Cal.App.4th 1450, 1458, 98 Cal.Rptr.3d 508.)

Defendant claims "[t]he only evidence presented in this case about why the shooting occurred supported the inference that [he] was outraged by Motley's argument with, and beating of, [defendant's] pregnant niece."

Even assuming that provocation would have caused an ordinarily reasonable person to act rashly and from passion rather than judgment, defendant had ample time to deliberate and reflect prior to firing the shots. After learning of the altercation between Oakley and Motley, he obtained a loaded firearm, drove several blocks in search of Motley, whom he believed was in Higgins's car, and maneuvered his car in front of Higgins's car. Only then did he start shooting. On this record, there is no substantial evidence defendant acted in the heat of passion when he fired the shots. Accordingly, the trial court had no duty to instruct the jury on attempted voluntary manslaughter.

(Dkt. No. 12 at 21.)

To be clear, the trial court rejected petitioner's request for an instruction regarding attempted voluntary manslaughter. (CT at 265.)

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. As noted by the California Court of Appeal, there was no substantial evidence that petitioner acted in the heat of passion when he fired the shots. Petitioner obtained a loaded gun, drove the vehicle in search of the car he believed Motley was riding in, and then maneuvered his car so that he could shoot Higgins' car. This evidence does not demonstrate that petitioner acted under the "direct and immediate influence of provocation." (<u>Id.</u>) Rather, "enough time had passed between the provocation and the attempted killing for a person of average disposition to 'cool off.'" (<u>Id.</u>) The outcome of the trial would not have been different had the jury received the involuntary

1   manslaughter instruction.  Accordingly, the failure to give this instruction did not violate

2   fundamental fairness.

3          The undersigned also observes that petitioner's defense was that he was not

4   involved in the shooting, rendering the attempted voluntary manslaughter instruction inconsistent

5   with his defense.  See Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984) (the failure to

6   instruct on a defense that is inconsistent with a defendant's theory of the case does not violate the

7   Constitution.)

8          For the reasons set forth above, this claim should be denied.

9          *Claim 3*

10          Petitioner argues that jury instruction CALCRIM No. 318 unfairly shifted the

11   burden of proof.  (See CT at 247 (CALCRIM No. 3.18).)  The California Court of appeal denied

12   this claim for the reasons stated herein:

> Defendant claims "[t]he use of pattern instruction CALCRIM [No.] 318 unfairly and improperly shifted the burden of proof," thereby violating his federal constitutional rights to a jury trial and due process. Again, we disagree.
>
> As given by the trial court, CALCRIM No. 318 instructed: "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements you may use those statements in two ways. [¶] One. To evaluate whether the witness's testimony in court is believable, and ... [¶] Two. As evidence that the information in those earlier statements is true."
>
> Defendant asserts that "[a]s worded, this instruction created an improper presumption that a witness's unsworn out-of-court statements are both true and deserving of greater belief than statements made in court under penalty of perjury."
>
> We recently rejected an argument that CALCRIM No. 318 lessens the prosecution's standard of proof by compelling the jury to accept out-of-court statements as true. (People v. Hudson (2009) 175 Cal.App.4th 1025, 1028, 96 Cal.Rptr.3d 713.) We explained: "CALCRIM No. 318 informs the jury that it may reject in-court testimony if it determines inconsistent out-of-court statements to be true. By stating that the jury 'may' use the out-of-court statements, the instruction does not require the jury to credit the earlier statements even while allowing it to do so." (Ibid.) We see no reason to revisit that decision here. Accordingly, defendant's

14

1               claim that CALCRIM No. 318 violated his federal constitutional

2               rights fails.

3  (Dkt. No. 12 at 21.)

4         On direct appeal in state court, petitioner argued that CALCRIM No. 318

5  "improperly told the jury to give more weight to Hall's out of court, unsworn statement than to

6  her court testimony given under oath and subject to cross-examination." (Respondent's Lodged

7  Document 7 at 40.)  Petitioner further argued that CALCRIM No. 318 "impermissibly elevated

8  the value of Hall's out of court unsworn statement over her trial testimony." (<u>Id.</u> at 47.)

9  Petitioner argued that as written and used in this case, "CALCRIM No. 318 improperly informed

10  the jury to believe the statements Hall made to the police – and thereby made the case against

11  appellant." (<u>Id.</u>)  Petitioner argued that CALCRIM No. 3.18 created a preferential presumption

12  favoring the truthfulness of out of court statements over trial testimony." (<u>Id.</u> at 48.)

13         A jury instruction that reduces the level of proof necessary for the government to

14  carry its burden "is plainly inconsistent with the constitutionally rooted presumption of

15  innocence." <u>Cool v. United States</u>, 409 U.S. 100, 104 (1972).  "All challenged instructions[,

16  however,] must be considered in light of all of the jury instructions and the trial record as a

17  whole." <u>Mendez v. Knowles</u>, 556 F.3d 757, 768 (9th Cir. 2009) (citing <u>Cupp v. Naughten</u>, 414

18  U.S. 141, 146–47 (1973)).

19         The finding by the California Court of Appeal that CALCRIM No. 318 did not

20  violate petitioner's constitutional rights was not an unreasonable application of clearly

21  established Supreme Court authority.  As noted by the state appellate court, CALCRIM No. 318

22  does not compel the jury to accept out-of-court statements as true.  The instruction tells the jury

23  that it *may* use out-of-court statements to evaluate the credibility of a witnesses's in-court

24  testimony and as evidence that the information in those earlier statements is true.  CALCRIM

25  No. 318 does not, as argued by petitioner, create a preferential presumption favoring the

26  truthfulness of out-of-court statements over trial testimony.  For these reasons. CALCRIM No.

318 did not reduce the level of proof necessary for the government to carry its burden.

        Accordingly, this claim should be denied.

        B.  Claim 4: Alleged Ineffective Assistance of Counsel

        *Legal Standard*

        The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).

        Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.; see also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  The court need not address both components if petitioner makes an insufficient showing on one.  Strickland, 466 U.S. at 697.  As both prongs of the Strickland test must be satisfied to establish a constitutional violation, failure to satisfy either prong requires that an ineffective assistance claim be denied.  See id., 466 U.S. at 697 (no need to address deficiency of performance if prejudice is examined first and found lacking); Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("[f]ailure to satisfy either prong of the Strickland test obviates the need to consider the other").

////

1    In other words, a reviewing court is not required to address the two parts of the

2  Strickland test in its ruling.  See Strickland, at 697.  As the Court stated in Strickland:

3         In particular, a court need not determine whether counsel's
          performance was deficient before examining the prejudice suffered
4         by the defendant as a result of the alleged deficiencies.  The object
          of an ineffectiveness claim is not to grade counsel's performance.
5         If it is easier to dispose of an ineffectiveness claim on the ground
          of lack of sufficient prejudice, which we expect will often be so,
6         that course should be followed.  Courts should strive to ensure that
          ineffectiveness claims not become so burdensome to defense
7         counsel that the entire criminal justice system suffers as a result.

8  Id.  "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the

9  principal allegation of ineffectiveness, [petitioner] must also prove that his Fourth Amendment

10  claim is meritorious and that there is a reasonable probability that the verdict would have been

11  different absent the excludable evidence in order to demonstrate actual prejudice."  Kimmelman

12  v. Morrison, 477 U.S. 365, 375 (1986).

13    In Harrington, the Supreme Court emphasized the application of Strickland to

14  ineffective assistance of counsel claims and its relationship to § 2254(d)'s deferential standard of

15  review.  Id., 131 S. Ct. at 770.  "The pivotal question is whether the state court's application of

16  the Strickland standard was unreasonable[,]" which is a different question from "asking whether

17  defense counsel's performance fell below Strickland's standard."  Harrington, 131 S. Ct. at 785.

18         Establishing that a state court's application of Strickland was
          unreasonable under § 2254(d) is all the more difficult.  The
19         standards created by Strickland and § 2254(d) are both "highly
          deferential," . . . and when the two apply in tandem, review is
20         "doubly" so.  The Strickland standard is a general one, so the range
          of reasonable applications is substantial.  Federal habeas courts
21         must guard against the danger of equating unreasonableness under
          Strickland with unreasonableness under § 2254(d).  When
22         § 2254(d) applies, the question is not whether counsel's actions
          were reasonable.  The question is whether there is any reasonable
23         argument that counsel satisfied Strickland's deferential standard.

24  Harrington, 131 S. Ct. at 788 (citations omitted).

25    In assessing an ineffective assistance of counsel claim "[t]here is a strong

26  presumption that counsel's performance falls within the wide range of professional assistance."

Kimmelman, 477 U.S. at 381 (citation omitted).  Additionally, there is a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citation omitted).

*Analysis*

Petitioner argues that his trial counsel was ineffective for failing to procure Joshua Johnson as a witness at trial.  The California Court of Appeal denied this claim for the reasons herein:

> Finally, defendant contends his trial counsel was ineffective in "fail[ing] to exercise due diligence in procuring Johnson's presence at trial," or alternatively, the trial court erred in denying his motion to continue the trial so that his trial counsel could attempt to locate Johnson. As we shall explain, defendant's claim that his trial counsel was ineffective fails because there is no reasonable probability he would have obtained a better result had Johnson testified. Moreover, the trial court granted defendant's request to continue the trial to allow his trial counsel additional time to attempt to locate the witness. Thus, any assertion the trial court erred in denying defendant's request to continue the trial on that basis also fails.
>
> Trial in this matter commenced on May 19, 2009. Sometime prior to April 3, 2009, Johnson told an investigator retained by defendant's prior counsel that he was in Higgins's car at the time of the shooting, and defendant was not the shooter. FN5 Defendant's trial counsel, Nolan Del Campo, first learned of the statement approximately one month before trial. Del Campo first attempted to serve Johnson on May 15, 2009, four days before trial commenced. He was not successful.  Johnson did not have a home address, and the phone number listed in "the report" was disconnected. Thereafter, Del Campo entrusted Dossman to serve Johnson because the investigator previously had located Johnson through Dossman.
>
> FN5. Defendant's initial counsel, Andrea Miles, was relieved as defendant's counsel on April 3, 2009, and Nolan Del Campo was appointed on April 8, 2009.
>
> After the prosecution presented its case, the trial court asked whether the defense witnesses had been served, and Del Campo responded that they had. He explained that one of the witnesses, Dossman, had been personally served by him, and that the remainder had been personally served by Dossman. With the exception of the subpoena he served on Dossman, however, Del Campo did not have "any return on the subpoenas." Later that

afternoon, Del Campo advised the court that he had misspoken and that all of the witnesses except Johnson had been served. He explained that Dossman previously had advised him that all the witnesses had been served. Upon discovering that Johnson had not been served, Del Campo directed an investigator to attempt to locate him.

Thereafter, Del Campo sought to have Johnson's statement to the investigator admitted. The prosecutor objected on the ground he had not had an opportunity to cross-examine Johnson. The trial court sustained the objection. Thereafter, Del Campo asked the court to continue closing arguments until the following day so that he and the prosecutor could prepare, and he could "try again tonight to find [Johnson]." The court granted the request even though, as the court observed, Del Campo had failed to establish "whether or not [Johnson's] not here because of your error." FN6

FN6. Defendant asserts the trial court "declined to continue the trial so that counsel could locate Johnson and call him as a witness."  Not so. In the portion of the record cited by defendant, his trial counsel "request[ed] that we postpone the trial till I can get [ Dossman ] here or issue a warrant and have her brought here." (Italics added.) As discussed above, later in the proceedings, counsel asked to continue closing arguments until the following morning in part so that he could attempt to locate Johnson, and the court granted the request.

In defendant's view, Johnson's testimony that defendant was not the shooter, "combined with the defense evidence that [defendant] continuously remained in Dossman's house at the time of the shooting, Her's description of a vehicle different from the one [defendant] had access to, and Hall's trial testimony failing to identify [defendant], likely would have raised a reasonable doubt in the mind of at least one juror."

To establish the ineffective assistance of counsel, defendant must show (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's error or omission resulted in prejudice such that there is a reasonable probability the result would have been different absent the error. (Strickland v. Washington (1984) 466 U.S. 668, 687–688, 694 (Strickland); People v. Boyette (2002) 29 Cal.4th 381, 430, 127 Cal.Rptr.2d 544, 58 P.3d 391.) Where, as here, the defendant cannot establish prejudice, we need not consider whether counsel's representation was deficient. (Strickland, supra, 466 U.S. at p. 697.)

In assessing prejudice, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Strickland, supra, 466 U.S. at p. 695.)  "In making this determination, a court hearing

19

an ineffectiveness claim must consider the totality of the evidence before the judge or jury.... [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (Id. at pp. 695–696.) "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test...." (Id. at p. 693.) "The test ... must necessarily be based upon reasonable probabilities rather than upon mere possibilities...." (People v. Watson (1956) 46 Cal.2d 818, 837, 299 P.2d 243 (Watson ).)

Here, although the jury could have relied on Johnson's testimony to conclude defendant was not the shooter, having considered the totality of the evidence, we conclude there is no reasonable probability that it would have done so. The evidence defendant was the shooter was overwhelming. There was evidence he had a motive to shoot Motley, whom he believed was in Higgins's car. The shooting occurred shortly after defendant learned of the altercation between Motley and Oakley, defendant's niece. The physical evidence strongly suggested the Tahoe parked at the party was involved in the shooting. In particular, evidence was introduced that the casing found on the Tahoe was fired from the same gun as were casings found at the scene. While Her testified he thought the vehicle involved in the shooting was brown, both Higgins and Hall testified it was the white Chevy Tahoe parked at 6612 Burdett Way after the shooting. Defendant had access to the Tahoe. It was parked outside the party, and the keys were underneath the seat. Gunshot residue was found on defendant's left hand roughly two hours after the shooting, indicating he had handled a discharged firearm or ammunition within the past four hours.

Having considered the totality of the evidence, we conclude there is no reasonable probability defendant would have received a better result had Johnson testified defendant was not the shooter. While it is possible the jury would have reached a different verdict had Johnson testified, a mere possibility is insufficient. (Strickland, supra, 466 U.S. at p. 693; Watson, supra, 46 Cal.2d at p. 837, 299 P.2d 243.) Accordingly, defendant was not prejudiced by attorney Del Campo's performance, and defendant's ineffective assistance claim fails.

(Dkt. No. 12 at 22-23.)

////

////

////

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. The California Court of Appeal reasonably found that, based on the strong evidence against petitioner, there was no reasonable probability that the outcome of the trial would have been different had Johnson testified that he was the shooter. Petitioner had a motive to shoot Motley, who he believed was in Higgins' car. Petitioner had access to the Chevy Tahoe that Higgins and Hall told police had been at the scene of the shooting. The gun casings found at the scene matched the gun casing found in the Chevy Tahoe. Petitioner had gunshot residue on his hands. At trial, Higgins testified that petitioner was the driver of the Chevy Tahoe and she saw him shoot at her car. Grant Stomsvik, an investigator for the District Attorney's office, testified that Hall told him that petitioner was the shooter.

Based on the evidence set forth above, the California Court of Appeal reasonably found that the prejudice prong of the Strickland test had not been met. Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court shall assign a district judge to this action; and

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §

2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 6, 2012

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

lew1444.157